937 F.2d 268
 Lorraine Aucoin, Wife of/and John V. SANTOPADRE, Sr.,
Plaintiffs-Appellants,
v.
PELICAN HOMESTEAD & SAVINGS ASSOCIATION, Defendant-Appellee.
John V. SANTOPADRE, Sr., et al., Plaintiffs-Appellants,
v.
PELICAN HOMESTEAD & SAVINGS ASSOCIATION, Defendant-Appellee.
 Nos. 90-3622 and 90-3845.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 7, 1991.
 
 Douglas S. Draper, New Orleans, La., for plaintiffs-appellants in No. 90-3622.
 R. John Skinner, Baldwin & Haspel, Judy Lynn Burnthorn, Energy Center, Daryl G. Glorioso, Jack A. Ricci, New Orleans, La., for defendant-appellee.
 Douglas Scott Draper, LL & E Tower, Pamela Van Geffen, Friend, Wilson & Draper, New Orleans, La., for plaintiffs-appellants in No. 90-3845.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before REAVLEY, HIGGINBOTHAM, and DUHE, Circuit Judges.
 DUHE, Circuit Judge.
 
 
 1
 The builders of a hotel sued a bank that assumed the assets and liabilities of their insolvent lender after the lender was placed in receivership. The district court granted summary judgment in favor of the successor bank, holding that (1) unliquidated litigation liabilities against the insolvent bank had ceased to exist except against FSLIC as receiver; (2) the parties must honor the terms of settlement agreements signed before the lender became insolvent; and (3) under the settlement agreements, the builders had forfeited all ownership interest in the property. When the builders attempted to relitigate the ownership issue in Louisiana state court, the district court enjoined the state-court proceeding. We affirm.
 
 FACTS
 
 2
 In 1982 a real-estate partnership owned by John V. Santopadre, Sr. and his wife, Lorraine Aucoin Santopadre, began building the Avenue Plaza Hotel in New Orleans. The Santopadres' lender in this project was Gulf Federal Savings Bank. Between 1982 and 1986, the size of the debt increased as the Santopadres' financial condition worsened.
 
 
 3
 After disputing the terms and availability of the loans, the parties eventually executed two settlement agreements in May and July of 1986. The Santopadres agreed to transfer all partnership interest in Avenue Plaza to the bank in exchange for the bank's agreement to cancel all notes and to pay John Santopadre a $104,000 management fee.
 
 
 4
 In October 1986, the Santopadres sued the bank in Louisiana state court, seeking specific performance of the two settlement agreements or, in the alternative, tort damages for mental anguish and tarnishment of reputation. The Santopadres also filed a notice of lis pendens in Orleans Parish to protect their interest in the property during litigation.
 
 
 5
 A month later, the Federal Home Loan Bank Board (FHLBB) declared the bank insolvent and appointed FSLIC to act as receiver of the failed institution. In its capacity as receiver, FSLIC organized Gulf Federal Savings and Loan Association as a bridge bank. Through a purchase and assumption transaction, the bridge bank acquired some of the closed bank's assets and liabilities. Under the acquisition agreement, the bridge bank was obligated to discharge "all of [the closed bank's] liabilities, including but not limited to, those shown on [the closed bank's] books and records."
 
 
 6
 In July 1987, the bridge bank filed an answer and reconventional demand in the state action. In its pleading, the bridge bank asserted that FSLIC had transferred to it "substantially all of the assets and liabilities of Gulf Federal Savings Bank." A few months later, the bridge bank merged into Pelican Homestead and Savings Association. Two months later, Pelican filed another answer and reconventional demand in the state action. The Louisiana court interpreted this action as Pelican's substitution of itself for the bridge bank as defendant.
 
 
 7
 In October 1989, the Santopadres sued Pelican in federal district court, alleging mail fraud and extortion under RICO as well as pendent state claims of fraud, bad faith, breach of contract, breach of fiduciary duty, and negligence. Based on the alleged torts of the closed bank's employees through 1986, the Santopadres also sought rescission of all agreements between themselves and the closed bank.
 
 
 8
 In June 1990, Pelican filed a motion for summary judgment, seeking dismissal of the Santopadres' claims, enforcement of its right to 100 percent ownership of Avenue Plaza under the settlement agreements, and cancellation of the lis pendens. Two months later the district court granted Pelican's motion for summary judgment and dismissed with prejudice the Santopadres' claims. See Santopadre v. Pelican Homestead & Sav. Ass'n, 741 F.Supp. 1252, 1254 (E.D.La.1990). Finding that neither Pelican nor the bridge bank was a successor in interest to the closed association, the judge concluded that the Santopadres' alleged causes of action had ceased to exist, except against FSLIC as receiver.[1]
 
 
 9
 The judge explained that the agreement between FSLIC and the bridge bank did not envision the bridge bank's assumption of undisclosed or unliquidated claims. The court found, however, that both the bridge bank and Pelican were aware of the closed bank's obligations under the settlement agreements to pay Santopadre $104,000 and to cancel the notes executed in connection with the loans for Avenue Plaza. The court therefore enforced the 1986 settlement agreements. Concluding that the Santopadres had no claim to the Avenue Plaza property, the court ordered the cancellation of the lis pendens.
 
 
 10
 The Santopadres again sued Pelican in Louisiana state court, filing another lis pendens against the land underlying Avenue Plaza. They claimed that the settlement agreements did not transfer a 12.5 percent interest that they allegedly retained in this land. The pleadings of the Santopadres in the state action were almost identical to their pleadings in the earlier federal action.
 
 
 11
 Claiming that the Santopadres were trying to relitigate in state court the ownership of Avenue Plaza, Pelican asked the federal district court to enjoin the state-court proceeding. The federal court enjoined the Santopadres from prosecuting the state action, finding the state action precluded by the earlier summary judgment in federal court. The district court also cancelled the second lis pendens.
 
 
 12
 The Santopadres now claim that the district court erred in granting summary judgment for Pelican because they raised genuine issues of material fact on whether the bridge bank, and later Pelican, assumed the unliquidated claims of the Santopadres against Gulf Federal Savings Bank. The Santopadres also claim that since the summary judgment in federal court failed to address their alleged 12.5 percent interest in the land underlying Avenue Plaza, the district court erred in enjoining the state proceeding.
 
 DISCUSSION
 
 13
 I. Assumption of Unliquidated Litigation Liabilities
 
 
 14
 In reviewing a grant of summary judgment, we use the same standard of review used by the district court. Netto v. Amtrak, 863 F.2d 1210, 1212 (5th Cir.1989). To support a grant of summary judgment, the evidence, including affidavits, depositions, answers to interrogatories, and admissions on file, must demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Lowery v. Illinois Cent. Gulf R.R. Co., 891 F.2d 1187, 1190 (5th Cir.1990); Netto, 863 F.2d at 1212.
 
 
 15
 Under this standard, we consider the evidence "in the light most favorable to the party resisting the motion." Trevino v. Celanese Corp., 701 F.2d 397, 407 (5th Cir.1983). The nonmovant, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The party opposing a properly supported motion for summary judgment must go beyond the mere pleadings to set forth specific facts showing that there is a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).
 
 
 16
 The Santopadres argue that the purchase and assumption agreement between FSLIC and the bridge bank determines which assets and liabilities the bridge bank, and later Pelican, acquired. As the Santopadres correctly note, this agreement purports to transfer all the closed bank's liabilities with a few specific exclusions that do not include litigation liabilities.[2]
 
 
 17
 In addition, the Santopadres argue that the bridge bank and Pelican affirmatively accepted the closed bank's litigation liabilities by joining as parties in the state suit for enforcement of the settlement agreements. The Santopadres remind us that the bridge bank admitted in its pleadings that it had assumed substantially all of the closed bank's assets and liabilities. Later, after the bridge bank merged into Pelican, Pelican substituted itself for the bridge bank as defendant.
 
 
 18
 Neither an inartfully drafted agreement nor voluntary participation in a pending lawsuit controls the payment of unliquidated claims after FSLIC liquidates a failed institution. Instead, federal law controls this issue:
 
 
 19
 As a matter of federal law, the FHLBB worthlessness finding foreclosed any right general creditors previously may have had to payment out of [the closed bank's] assets.
 
 
 20
 Gulley v. Sunbelt Savs., 902 F.2d 348, 351 (5th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 673, 112 L.Ed.2d 665 (1991).
 
 
 21
 Federal regulations establish a priority system for the payment of unsecured claims against an institution being liquidated. See 12 C.F.R. Sec. 360.2 (1991) (formerly codified at id. Sec. 389.11 (1990) and id. Sec. 569c.11(a) (1989)). The regulations accord priority to persons with claims for withdrawable accounts and to persons holding any "other claims which have accrued and become unconditionally fixed on or before the date of default." Id.
 
 
 22
 Under these regulations, FSLIC must begin with the top class of creditors and pay the valid claims of each class in full before moving to the next lower class. For the first class of creditors that cannot be paid in full, FSLIC must make pro rata payments to all members of the class. At that point, nothing remains for lower classes of creditors. See 12 C.F.R. Sec. 360.2(d) (1991).
 
 
 23
 The FHLBB declared Gulf Federal Savings Bank "insolvent in that its assets are less than its obligations to its creditors and others, including the holders of its withdrawable accounts." Because the assets of Gulf Federal Savings Bank were insufficient to satisfy its liabilities to its depositors, no funds remained to pay the claims of class members with lower priorities. The Santopadres have not challenged this worthlessness determination, which is a final agency action reviewable under the Administrative Procedure Act in an action against the FHLBB. See 5 U.S.C. Sec. 701 et seq.; Federal Savs. & Loan Ins. Corp. v. Locke, 718 F.Supp. 573, 586 (W.D.Tex.1989).
 
 
 24
 Like the appellants in Gulley, the Santopadres are "unsecured general creditors [who] no longer have a claim against the transferred assets." Gulley, 902 F.2d at 351. The Santopadres, however, attempt to distinguish Gulley on the grounds that the purchase and assumption agreement in that case specifically provided that the bridge bank assumed no liabilities to unsecured general creditors. See id. at 349. Despite the absence of this language in the agreement between FSLIC and the bridge bank, the result is the same.
 
 
 25
 In liquidating the bank, FSLIC followed the federal regulations for meeting the claims of creditors and depositors. At the end of this procedure, FSLIC had no liability to pay off the claims of unsecured creditors. It is not plausible that FSLIC and the bridge bank intended that this nonexistent liability would be somehow revitalized and passed to the bridge bank in the purchase and assumption transaction.
 
 
 26
 Since the insolvent bank's assets were insufficient to cover even the claims of secured creditors and depositors, the Santopadres could have received nothing on their claims, regardless of the structure of the receivership. They have not challenged the findings of the FHLBB. The Santopadres are not entitled to a windfall from an unsuspecting purchaser of the assets merely because the FHLBB liquidated the bank. See Locke, 718 F.Supp. at 586 n. 3.
 
 
 27
 The Santopadres assume that the district judge based his grant of summary judgment solely on the language of the purchase and assumption agreement and on the intent of the parties in signing it. Some of the language in the opinion does suggest that the agreement played a role in determining which assets and liabilities the bridge bank assumed. Specifically, the opinion says that the acquisition agreement "does not envision [the bridge bank's] assuming any unknown contingent, unliquidated claims." Santopadre, 741 F.Supp. at 1253.
 
 
 28
 But elsewhere in the opinion, the district judge correctly recognizes that under federal law, unliquidated claims are not liabilities typically assumed by an acquiring association in a purchase and assumption agreement. Id. at 1253 n. 3. He also articulates the reason for this rule: in liquidating a failed association, FSLIC must be able to rely on the books and records of the association in determining its net worth. Id. Under any other rule, a purchase and assumption could not take place in the timely fashion necessary to ensure the "uninterrupted operation of the [nation's] banking system with resulting safety and liquidity of bank deposits." S.Rep. No. 1269, 81st Cong., 2d Sess., reprinted in 1950 U.S.Code Cong. & Admin.News 3765, 3765-66; see Campbell Leasing, Inc. v. FDIC, 901 F.2d 1244, 1248-49 (5th Cir.1990).
 
 
 29
 The district judge also correctly concluded that the closed bank's obligations under the settlement agreements were fixed, liquidated liabilities assumed by the bridge bank and later acquired by Pelican in the merger. He therefore ordered Pelican to pay Santopadre the stipulated $104,000 salary and to cancel the notes executed in connection with Avenue Plaza loans. In addition, based on the voluminous summary judgment evidence, the judge correctly concluded that in the two settlement agreements, the Santopadres relinquished all their ownership interest in Avenue Plaza.
 
 II. Injunction of the State Action
 
 30
 Federal law, not Louisiana law, applies in our determination of the preclusive effect of the district court's summary judgment. See Southwest Airlines Co. v. Texas Int'l Airlines, 546 F.2d 84, 94 (5th Cir.), cert. denied, 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977). " 'If state courts could eradicate the force and effect of federal court judgments through supervening interpretations of the state law of res judicata, federal courts would not be a reliable forum for final adjudication of ... claims.' " Id. (quoting Aerojet-General Corp. v. Askew, 511 F.2d 710, 716 (5th Cir.1975)).
 
 
 31
 Pursuant to the All Writs Statute, the district court enjoined the Santopadres' state action. See 28 U.S.C. Sec. 1651.[3] The Santopadres argue that this injunction was not valid under the Anti-Injunction Act, 28 U.S.C. Sec. 2283, because the district court's summary judgment failed to resolve the Santopadres' claim to a 12.5 percent interest in the land underlying Avenue Plaza.
 
 
 32
 Under the Anti-Injunction Act, a federal court may not enjoin proceedings in a state court "except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." Id. The district court concluded that its injunction was authorized by the third exception, commonly known as the relitigation exception.
 
 
 33
 The relitigation exception "was designed to permit a federal court to prevent state litigation of an issue that previously was presented to and decided by the federal court. It is founded in the well-recognized concepts of res judicata and collateral estoppel." Chick Kam Choo v. Exxon Corp., 486 U.S. 140, 147, 108 S.Ct. 1684, 1689-90, 100 L.Ed.2d 127 (1988). The exception applies, however, only if the parties to the original action actually disputed the issue and the trier of fact actually resolved it. See James Talcott, Inc. v. Allahabad Bank, Ltd., 444 F.2d 451, 459-60 (5th Cir.), cert. denied, 404 U.S. 940, 92 S.Ct. 280, 30 L.Ed.2d 253 (1971).
 
 
 34
 In determining which issues have been actually litigated, the federal court is "free to go beyond the judgment ... and may examine the pleadings and the evidence in the prior action." Id. at 459 n. 7. If "a question of fact is put in issue by the pleadings, and is submitted to the jury or other trier of facts for its determination, and is determined, that question of fact has been 'actually litigated.' " Id.
 
 
 35
 In ruling on this issue, we must focus exclusively on the record as it existed when the federal district court granted summary judgment for Pelican. Chick Kam Choo, 486 U.S. at 148, 108 S.Ct. at 1690. That record amply demonstrates that the Santopadres raised the issue of their alleged 12.5 percent interest in the property, that Pelican responded to that claim, and that the judge decided unequivocally that Pelican owns 100 percent of the Avenue Plaza property.
 
 
 36
 In the fact statement of their federal complaint, the Santopadres set out in detail their claims to 12.5 percent interest in the land underlying Avenue Plaza. The complaint alleges that when John Santopadre signed the mortgage purporting to transfer the 12.5 percent interest, the partnership was no longer in existence. The complaint further asserts that since John Santopadre signed the mortgage only in his capacity as general partner, the mortgage was not valid against him individually. His 12.5 percent interest in the land, therefore, was not transferred pursuant to the settlement agreements.
 
 
 37
 Pelican's answer alleges that the Santopadres validly mortgaged the partnership's 12.5 percent interest in the land underlying Avenue Plaza because various acts of Lorraine Aucoin Santopadre had effected a continuation of the partnership under Louisiana law. The answer asserts alternatively that even if the mortgage was not valid as an act of the partnership, it was valid against John Santopadre individually and against Lorraine Santopadre through her ratification of it. Finally, Pelican's motion for summary judgment specifically asks the court to recognize "Pelican's ownership, free and clear of all claims by Santopadre" in the "real estate and improvements" of the Avenue Plaza property.
 
 
 38
 In its order granting summary judgment, the district court does not explicitly discuss whether the operation of Louisiana law had dissolved the partnership when John Santopadre signed the mortgage or whether John Santopadre's signature as general partner was effective against him individually. However, "[i]f an issue is raised and the party who has the burden fails in his proof and the issue is decided against him, he is just as much bound by collateral estoppel as though he had presented a barrel of testimony." United States v. Silliman, 167 F.2d 607, 617 (3d Cir.), cert. denied, 335 U.S. 825, 69 S.Ct. 48, 93 L.Ed. 379 (1948), cited in C. Wright & A. Miller, 18 Federal Practice and Procedure, Sec. 4419 at 179 n. 6 (1981).
 
 
 39
 Having raised the ownership issue before the federal district court, the Santopadres had an obligation to present enough proof to raise a genuine issue of material fact that would preclude summary judgment. By cancelling the lis pendens, the district court effectively ruled that Pelican owns the Avenue Plaza property, free and clear of all claims by the Santopadres. The doctrine of collateral estoppel prevents the Santopadres from relitigating this issue in state court. The district court, therefore, properly enjoined the state action.
 
 III. Conclusion
 
 40
 Since under federal law the bridge bank did not assume any unliquidated litigation liabilities of the closed bank, the Santopadres cannot now assert a claim against Pelican, the bank into which the bridge bank merged. We therefore affirm the district court's summary judgment for Pelican on this issue.
 
 
 41
 We also affirm the district court's conclusion on summary judgment that Pelican is obligated to pay John Santopadre $104,000 and to cancel all notes associated with the Avenue Plaza loans. These liabilities were fixed before the FHLBB declared the bank insolvent. Based on the summary judgment evidence, the judge correctly concluded that the Santopadres relinquished all ownership interest in Avenue Plaza.
 
 
 42
 Finally, we conclude that the district court correctly enjoined the Santopadres from relitigating the ownership issue in state court. In federal court, the Santopadres asserted their claims to a 12.5 percent interest in the land underlying Avenue Plaza, and the court decided the issue against them. Under the Anti-Injunction Act, the federal court is entitled to protect or effectuate this judgment by enjoining the action in state court.
 
 
 43
 AFFIRMED.
 
 
 
 [1]
 In a footnote in the opinion, the district judge noted that any claims brought by the Santopadres against FSLIC as receiver would probably be barred by the D'Oench, Duhme doctrine. See Santopadre, 741 F.Supp. at 1253 n. 4 (citing D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942))
 
 
 [2]
 FSLIC, as receiver for the bank, arranged for this transaction, which involved the bridge bank as the ACQUIRING ASSOCIATION and Gulf Federal Savings Bank as the CLOSED ASSOCIATION. The acquisition agreement provides:
 The ACQUIRING ASSOCIATION hereby expressly assumes and agrees to pay, perform and discharge all of the CLOSED ASSOCIATION's liabilities, including but not limited to, those shown on the CLOSED ASSOCIATION's books and records at such time as the Receiver takes possession of the CLOSED ASSOCIATION.
 The agreement limited the assumption of liabilities as follows:
 The term "liability" as used in this section does not refer to any obligation of the CLOSED ASSOCIATION to its stockholders for or in connection with their stock holdings, or any obligation to indemnify controlling persons, directors, officers or other persons as a result of suits arising from claims described in Section 1(a), and the ACQUIRING ASSOCIATION specifically does not assume by virtue of this Agreement any such obligations to the stockholders or for indemnification of the directors, officers or employees of the CLOSED ASSOCIATION.
 
 
 [3]
 The statute provides:
 The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their jurisdictions and agreeable to the usages and principles of law.
 28 U.S.C. Sec. 1651(a).